UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ALISON WADE, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 3:15CV47 (DJS) |
| | : | |
| CAROLYN W. COLVIN, | : | |
| ACTING COMMISSIONER OF | : | |
| SOCIAL SECURITY, | : | |
| Defendant. | : | |

<u>RULING ON THE PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER</u>

This is an administrative appeal following the denial of an application filed by the

plaintiff, Alison Wade ("Wade"), for disability insurance benefits ("DIB").[1] It is brought pursuant

to 42 U.S.C. §§ 405 (g) and 1383 (c)(3).

Wade now moves for judgment on the pleadings, seeking an order reversing the decision

of the Commissioner of the Social Security Administration ("Commissioner"). In the alternative,

Wade seeks an order remanding her case for a rehearing. The Commissioner, in turn, has moved

for an order affirming her decision.

The issues presented are whether: (1) the ALJ properly applied the treating physician rule;

and (2) the ALJ properly assessed Wade's credibility. For the following reasons, Wade's motion

---

[1]Under the Social Security Act, the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]." 42 U.S.C. § 405(b)(1). The Commissioner's authority to make such findings and decisions is delegated to administrative law judges ("ALJs"). *See* 20 C.F.R. §§ 404.929 *et seq*. Claimants can in turn appeal an ALJ's decision to the Social Security Appeals Council. *See* 20 C.F.R. §404.967. If the Appeals Council declines review or affirms the ALJ opinion, the claimant may appeal to the United States district court. Section 205 (g) of the Social Security Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405 (g).

for judgment on the pleadings is granted in part and denied in part, and the Commissioner's

motion for an order affirming her decision is denied.

<u>FACTS</u>

An examination of the record discloses the following: On November 4, 2011,Wade filed

an application for DIB for an alleged disability that commenced on May 1, 2010.[2] On January 19,

2012, a disability adjudicator in the Social Security Administration denied her application for

disability benefits and thereafter denied her request for reconsideration.

On May 15, 2013, Wade appeared with counsel for a hearing before an ALJ. On June 17,

2013, the ALJ issued a decision denying benefits. On November 13, 2014, the Appeals Council

denied Wade's request for review of that decision thereby making the ALJ's decision the final

decision of the Commissioner. This appeal followed.

Wade, who was born on October 7, 1960, has a high school education. Her past relevant

work was as a cashier, answering service operator, security officer, emergency medical technician,

and hospital admission clerk. Her most recent employment, from May 2011 through July 2011,

involved answering phones from a seated position all day. According to Wade, she left that job,

and other previous jobs, because "[i]t was too uncomfortable for me to work the job and so I

would call out and I would get to the point where I would be about to be fired because of my

attendance and I would quit." (Doc. # 8-3, at 66, p. 65).[3]

_____

[2]In order to be entitled to disability benefits, a claimant must "have enough social security earnings to be insured for disability, as described in § 404.130." 20 C.F.R. § 404.315 (a)(1). In this instance Wade had sufficient social security earnings to be insured through June 30, 2016.

[3]The designation "at 66" refers to the page number (indicated at the top of the page) assigned by the Court's electronic filing system within the cited document (in this case, document 8-3). The designation "p. 65" refers to the page number (indicated at the bottom of the

Medical Evidence

A. Physical Impairment

Since at least June 5, 2009, Wade has treated with Dr. David Walker, a family practitioner, for, among other things, chronic lower back and leg pain. In a treatment note dated March 5, 2012, Dr. Walker indicated that "[a]pproximately 9 years ago [Wade] had [a] failed lumbar discectomy[4]. She tends to have very minimal back pain and mostly pain that is radiating in the legs RIGHT worse [than] LEFT associated with numbness and tingling all the way to the feet." (Doc. # 8-9, at 33, p. 497). On March 23, 2011, Dr. James Ryan examined Wade at the request of the Social Security Administration. Wade stated to Dr. Ryan that her back pain began in 2004 following a fall down a flight of stairs. Dr. Ryan's physical examination findings included the following: "Forward bending in the lumbrosacral spine is limited to 40 degrees. There is also decreased strength in the right leg with resistance to flexion and extension. There is pain in the low back. Straight leg raising on the right at 10 degrees, left at 20 degrees. Remaining range of motion of the hands, wrist, elbows, shoulders, spine, hips, knees, and ankles are otherwise normal." (Doc. # 8-8, at 74, p. 377).

B. Mental Impairment

The medical records in this case reflect that Wade was evaluated and treated by Dr. Ranjani Kurukulasuriya ("Dr. Kuru"), a psychiatrist at Community Health Resources ("CHR"), between June 2010 and December 2012. During that period, Dr. Kuru consistently reported a

---

page) assigned within the administrative record filed by the Commisisoner.

[4]"Discectomy is surgery to remove lumbar (low back) herniated disc material that is pressing on a nerve root or the spinal cord." www.webmd.com/back-pain/discectomy-or-microdiscectomy-for-a-herniated-disc (last visited March 18, 2016).

diagnosis of "[m]ajor depression, recurrent, without psychotic features" with continuing symptoms of "anxiety and insomnia." (Doc. # 8-9, at 59, p. 523). Dr. Kuru's records also indicate a history of substance and alcohol abuse characterized by Dr. Kuru as being "in remission." (*Id.*). Notes from a number of other treating physicians, including four psychiatrists (Dr. Juan Sosa, Dr. Nathan Massey, Dr. Asha Qusba, and Dr. Jonathan Greenberg) and Dr. Walker, likewise reflect a diagnosis of chronic depression and a history of substance and alcohol abuse.

In his treatment notes from a June 17, 2010, session with Wade, Dr. Kuru indicated that "[t]he patient is unemployed and looking for employment, and is utilizing vocational counseling services through this agency [CHR] . . . ." (Doc. # 8-8, at 108, p. 411). On or about May 27, 2010, Wade signed a CHR Adult Recovery Treatment Plan relating to the agency's Employment Support Program. In that plan, Wade identified her goal as follows: "To have a 40 hr job with benefits and not live pay check to pay check." (*Id.* at 110, p. 413). For purposes of reaching her goal, Wade listed her strengths as "[c]an make decision quickly, smart learn quickly," and barriers to reaching her goal as "[d]rugs and depression." (*Id.*). She subsequently signed a nearly identical Plan on September 24, 2010. (*Id.* at 117, p. 420). In a Client Progress Note concerning an April 20, 2011 visit, Dr. Kuru stated the goal for Wade as "[m]aintain her current level of functioning and assist in getting employment and coverage along with maintenance of her sobriety." (*Id.* at 85, p. 388). In a note written after her next visit with Dr. Kuru on July 19, 2012, the doctor indicated that Wade was "unemployed at this time." (Doc. # 8-9, at 60, p. 524).

Dr. Kuru's treatment records reflect fluctuations in Wade's depression-related symptoms throughout the period he treated her. In a treatment note dated April 21, 2011, Dr. Kuru indicated that Wade's mood was "depressed," but that she had "no agitation or undue anxiety." (Doc. # 8-8,

at 84, p. 387). On September 4, 2012, Dr. Kuru wrote that Wade "continues to have high anxiety, shakiness and panic attacks," (Doc. # 8-9, at 58, p. 522), but on December 3, 2012, he wrote that Wade "appears calm and much less anxious." (Doc. # 8-10, at 90, p. 630).

Between June 2010 and December 2012 Wade experienced three significant events in her life that were considered major "stressors" and had a negative effect on her mental health. These events were a breakup with her boyfriend, the death of her father, and the lengthy illness and eventual death of her mother. In August 2010 Wade was referred to the Enfield Partial Hospitalization Program ("PHP") because she was very depressed, and she continued to receive treatment there until October 2010. On October 4, 2010, Wade was admitted to the Psychiatric Unit at Johnson Memorial Hospital as the result of taking a medication overdose. Hospital records indicate that Wade denied attempting suicide, but stated that "she was trying to 'numb' herself." (Doc. # 8-8, at 2, p. 305). Wade was discharged from Johnson Memorial Hospital on October 7, 2010, with a final diagnosis of "[m]ajor depressive disorder with elements of impulsivity." (*Id.* at 3, p. 306). She then resumed treatment with Dr. Kuru.

Although Dr. Kuru saw Wade between June 2010 and December 2012, there were gaps in his evaluation and treatment of her. Dr. Kuru did not see Wade from January 2011 until April 2011 due to cancellations by Wade or her failure to show up for appointments.[5] Dr. Kuru also did not see Wade from April 2011 until July 2012. In a treatment note written on July 23, 2012, Dr. Kuru stated that "[t]he patient was last seen here on April 20, 2011." (Doc. # 8-9, at 60, p. 524). He also noted, however, that Wade had been "receiving therapy on a regular basis" during that

_____

[5]Wade did, however, engage in treatment with Dr. Massey in the Enfield Partial Hospitalization Program during that time.

interval. (*Id.*). She had also seen Dr. Walker on September 19, 2011. Dr. Walker noted that she

presented "with worsening depression and anxiety since the death of her father in April of this

year. She has been off of her psychiatric medications [and] . . . no longer sees the psychiatric

clinic." (Doc. # 8-10, at 55, p. 595). On May 27, 2012, Dr. Walker signed a form concerning

Wade that had boxes checked next to the following statements:

> I hereby state that the above-noted individual has been a patient
> of mine and, in my best medical opinion, is totally disabled
> without consideration of any past or present drug and/or
> alcohol use. Drug and/or alcohol use is not a material cause
> of this individual's disability. In my best medical opinion the
> use is not material because:
>  . . . .
> My patient's use of drugs and/or alcohol is a symptom of h[er]
> condition, and /or is a form of self-medication. The disability
> is independent of any use.

(Doc. # 8-8, at 154, p. 457). The form signed by Dr. Walker did not include any other information

and a section for comments was left blank.

In connection with Wade's application for DIB, Dr. Kuru completed a

Psychiatric/Psychological Impairment Questionnaire dated September 7, 2012. Dr. Kuru reported

a  diagnosis of "major depressive disorder recurrent, moderate w/out psychotic features with

anxiety." (Doc. # 8-8, at 155, p. 458). In assessing various categories of mental activities, Dr.

Kuru offered his opinion that Wade was markedly limited[6] as to her abilities "to maintain

attention and concentration for extended periods,"  and "to complete a normal workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace without an

unreasonable number and length of rest periods." (*Id.* at 158-59, pp. 461- 62). He also opined that

---

[6]A rating of markedly limited "effectively precludes the individual from performing the
activity in a meaningful manner." (Doc. # 8-8, at 157, p. 460).

she was moderately limited[7] as to several other categories, including the abilities "to understand and remember detailed instructions," "to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance," "to work in coordination with or proximity to others without being distracted by them," "to accept instructions and respond appropriately to criticism from supervisors," and "to travel to unfamiliar places or use public transportation." (*Id.* at 158-160, pp. 461-63).

Dr. Kuru indicated that Wade was capable of tolerating low work stress, but also stated that "anxiety and panic episodes exacerbates leaving work and calling out sick." (*Id.* at 160, p. 463). He further indicated that Wade's "anxiety exacerbates pain in back and legs, [and] headaches." (*Id.* at 161, p. 464). Dr. Kuru estimated that Wade would likely be absent from work "[m]ore than three times a month" as a result of her impairments. (*Id.* at 162, p. 465).

In early 2013, Wade was seen at the Enfield office of CHR, rather than the Bloomfield office to which she had previously gone. On March 18, 2013, Dr. Jonathan Greenberg, a psychiatrist at the Enfield office , examined Wade and assessed her as "a woman with chronic depression, dysthymia[8], who is abusing alcohol and nicotine and marijuana, who has a sleep disturbance and also an anxiety disorder." (Doc. # 8-10, at 86, p. 626). In that same report, Dr. Greenberg expressed his view that "[s]he has a histrionic air to her . . . [and] has a stable, more

---

[7]A rating of moderately limited "significantly affects but does not totally preclude the individual's ability to perform the activity." (Doc. # 8-8, at 157, p. 460).

[8]"Dysthymia, sometimes referred to as mild, chronic depression, is less severe and has fewer symptoms than major depression. With dysthymia, the depression symptoms can linger for a long period of time, often two years or longer. Those who suffer from dysthymia can also experience periods of major depression - - sometimes called 'double depression.'" www.webmd.com/depression/guide/chronic-depression-dysthymia (last visited March 18, 2016).

angry intense mood than depressed or sad." (*Id.*).

On May 6, 2013, Dr. Greenberg completed the same eight-page Psychiatric/Psychological Impairment Questionnaire form as had previously been completed by Dr. Kuru. Dr. Greenberg's form states that the "[d]ate of most recent exam" was "3/18/13." (Doc. # 8-10, at 91, p. 631). The administrative record in this case does not indicate that Dr. Greenberg examined Wade on any date other than March 18, 2013.[9] In the Questionnaire, Dr. Greenberg reported a diagnosis of "major depressive disorder moderate recurrent; anxiety disorder; cann[a]bis + nicotine dependence." (*Id.*). Whereas Dr. Kuru had rated two categories of Wade's mental activities as markedly limited, Dr. Greenberg rated sixteen categories as markedly limited. These categories included, but were not limited to, the abilities "to remember locations and work-like procedures," "to carry out simple one or two-step instructions," "to make simple work related decisions," and "to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness." (*Id.* at 94-96, pp. 634-36).

Dr. Greenberg opined that Wade was incapable of tolerating even low work stress based on her "[h]istory of . . . responses to daily stress since onset of treatment." (*Id.* at 97, p. 637). He also indicated that Wade "has attempted working over past years and is impaired by her anxiety, panic, and difficulty with toleration of and understanding others." (*Id.* at 96, p. 636). Dr. Greenberg estimated that Wade would likely be absent from work "[m]ore than three times a

---

[9]Dr. Greenberg's form lists the "[d]ate of first treatment" as "5/1/2012." (Doc. # 8-10, at 91, p. 631. Dr. Kuru's form likewise lists the "[d]ate of first treatment" as "5/1/2012." (Doc. # 8-8, at 155, p. 458). It is not clear why either physician indicated a date of first treatment as 5/1/2102. The record contains notes from Dr. Kuru indicating treatment of Wade as early as June 2010, but he himself reported that he did not see her from April 2011 until July 2012. The only record of treatment by Dr. Greenberg is that provided by him on March 18, 2013.

month" as a result of her impairments. (*Id.* at 98, p. 638).

The ALJ also received medical evidence from non-treating sources. Dr. James Ryan conducted an Internal Medicine Consultative Examination of Wade on March 23, 2011. Dr. Ryan's resulting report focused on Wade's physical condition and functional limitations resulting from back and leg issues. In connection with the reconsideration of the initial denial of Wade's application for DIB, a state agency psychologist, Robert Sutton, assessed Wade's mental residual functional capacity and concluded, among other things, that although she "may have difficulty carrying out detailed instructions, maintaining attention/concentration for extended periods, working near others without distracting them and completing a normal workweek without some symptom presentation . . . [s]he appears to have the capacity to perform simple work when not abusing substances." (Doc. # 8-4, at 28, p. 130). This assessment, which was signed on April 20, 2012, was based on a review of medical records and Wade's own statements. Under the heading "Weighing of Opinion Evidence," Dr. Sutton noted, "There is no indication that there is medical or other opinion evidence." (*Id.* at 25, p. 127).

Hearing Testimony

At the May 15, 2013, hearing before the ALJ, Wade testified that she has "had depression with anxiety most of my life," and that a back injury she suffered in 2002 "made it that much worse and contributed with the anxiety and the depression, because I was in pain all the time." (Doc. # 8-3, at 67, p. 66). She also testified that surgery she had in 2003 failed to alleviate her back pain and that she is in pain "[a]ll the time." (*Id.* at 72, p. 71). Wade described her pain as follows: "It feels like I'm having a migraine in my legs and my lower back." (*Id.*). She stated that weather, exercise, and lifting anything over 10 or 12 pounds make her pain worse, but that

medication makes the pain go away for "[a] couple of hours." (*Id.*).

With regard to treatment of her mental health issues, Wade testified that she has counseling sessions once a week and sees a psychiatrist either once a month or once every three months depending on what the psychiatrist determines she needs. When asked whether that treatment is helpful, she answered: "I think so. . . . It helps me calm down and it helps me think about different ways of associating with people and trying to . . . get along socially a little better." (*Id.* at 69, p. 68). She further indicated that she has been compliant with her prescribed treatment to the best of her ability, but that there have been times when she was not totally compliant.

With regard to physical activities, Wade testified that in a typical week she drives two or three times. She drives to the grocery store, to go visit her daughter and granddaughter, and to medical appointments. She does as little as possible in the way of household chores, but also testified that she does her own cooking, cleaning, and laundry. She stated that she had "assisted hospice caring for my mother over the last year until she passed in January," but had not provided "any custodial care to her in terms of activities of daily living." (*Id.* at 74, 75, pp. 73, 74). She also testified that she had been helping to care for her two year old granddaughter "[f]or about a year, once or twice a week." (*Id.* at 75, p. 74).). This care included taking her granddaughter to the park, changing her diapers, and getting her dressed. On those occasions when she watches her granddaughter her son-in-law is in the house working from home.

A vocational expert, Dr. Steven Sacks, also testified at the May 15, 2013 hearing. The vocational expert testified that an individual who was able to perform light work, but was limited to simple, routine, repetitive tasks in a work environment free of fast-paced production requirements, with few, if any, workplace changes and only occasional contact with the public or

co-workers would not be able to perform Wade's past jobs. According to the vocational expert that same individual could, however, work as: (1) a hand packer, as to which there were 2,200 jobs in Connecticut and 212,000 in the national economy; (2) a production worker, as to which there were 1,400 jobs in Connecticut and 151,000 in the national economy; or (3) a production inspector, as to which there were 1,200 jobs in Connecticut and 87,000 in the national economy. He further testified that such an individual could perform those same three jobs with the further limitation that she would require the opportunity to change positions between sitting and standing at will. If the hypothetical individual could only occasionally understand and remember one or two step instructions and could never carry out simple one or two step instructions, however, the individual would be precluded from all work. Likewise, if the individual were to be absent or away from the work station for up to 15 percent of a typical day or work week, or absent from work more than three times a month, the individual would not be able to sustain employment.

The ALJ's Decision

In his decision, the ALJ found that Wade had not engaged in substantial gainful activity since the alleged onset date (May 1, 2010) and had the following severe impairments: affective disorder; anxiety disorder; substance abuse disorder; and lumbar degenerative disc disease. He also found, however, that Wade had the residual functional capacity to perform light work with certain limitations and that there were jobs that exist in significant numbers in the national economy that she could perform. Consequently the ALJ concluded that Wade was not disabled for purposes of the Social Security Act.

In reaching his decision, the ALJ afforded "minimal weight" to the opinions expressed in the Psychiatric/Psychological Impairment Questionnaires completed by the treating physicians Dr.

-11-

Kuru and Dr.Greenberg. (Doc. # 8-3, at 30, 31, pp. 29, 30).While acknowledging that the state agency psychologist, Dr. Sutton, was "a non-examining and non-treating expert source," the ALJ "afforded some weight" to his opinion in determining Wade's residual functional capacity because "it was consistent with the medical evidence as a whole." (*Id.* at 29, p. 28). The ALJ also found that Wade's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely credible . . . ."  (*Id.* at 24, p. 23).

STANDARD

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205 (g) of the Social Security Act, 42 U.S.C. § 405 (g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, [are] conclusive . . . ." 42 U.S.C. § 405 (g). Accordingly, the court may not make a *de novo* determination of whether a plaintiff is disabled in reviewing a denial of disability benefits. *Id.*; *Wagner v. Secretary of Health and Human Services*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the court's function is to ascertain whether the Commissioner applied the correct legal principles in reaching his conclusion, and whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). Therefore, absent legal error, this court may not set aside the decision of the Commissioner if it is supported by substantial evidence. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). Further, if the Commissioner's decision is supported by substantial evidence and not affected by legal error, that decision will be sustained, even where there may also be substantial evidence to support the plaintiff's contrary position. *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982).

The Second Circuit has defined "substantial evidence" as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on Behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Substantial evidence must be "more than a scintilla or a touch of proof here and there in the record." *Williams*, 859 F.2d at 258.

The Social Security Act establishes that benefits are payable to individuals who have a disability. 42 U.S.C. § 423 (a)(1). "The term 'disability' means . . . [an] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . ." 42 U.S.C. § 423 (d)(1). In order to determine whether a claimant is disabled within the meaning of the Social Security Act, the ALJ must follow a five-step evaluation process as promulgated by the Commissioner.[10]

In order to be considered disabled, an individual's impairment must be "of such severity that he is not only unable to do his previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423 (d)(2)(A). "'[W]ork which exists in the national economy' means work which exists in significant numbers

---

[10]The five steps are as follows: (1) The Commissioner considers whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner considers whether the claimant has a "severe impairment" which limits her mental or physical ability to do basic work activities; (3) if the claimant has a "severe impairment," the Commissioner must ask whether, based solely on the medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider her disabled, without considering vocational factors such as age, education, and work experience; (4) if the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work; and (5) if the claimant is unable to perform her past work, the Commissioner then determines whether there is other work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps. 20 C.F.R. § 416.920 (a)(4)(i)-(v).

either in the region where such individual lives or in several regions of the country." *Id.*[11]

DISCUSSION

On appeal Wade has raised issues concerning the ALJ's application of the treating physician rule and his assessment of her credibility. Each of these issues will be discussed below. Notably, Wade has represented that she "does not dispute the physical limitations found for Ms. Wade by the ALJ . . . ." (Doc. # 11, at 3 n. 5). For that reason, this ruling will focus on the ALJ's decision as it relates to Wade's mental health.

A. Treating Physician Rule

Wade contends that the ALJ failed to properly weigh the medical evidence in the record. Specifically, she argues that "[b]ecause the opinions from treating psychiatrists Kuru[] and Greenberg are based on appropriate clinical and diagnostic psychiatric findings and are uncontradicted by other substantial evidence in the record, their opinions should have been given controlling weight." (Doc. # 11, at 22).

The Commissioner responds that the ALJ properly considered the reports and conclusions of Dr. Kuru and Dr. Greenberg. Specifically, she argues that the findings and conclusions of Dr. Kuru and Dr. Greenberg were "based largely on Plaintiff's subjective reports, and inconsistent with the record as a whole." (Doc. # 12-1, at 28).

"[T]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable

---

[11]The determination of whether such work exists in the national economy is made without regard to: (1) "whether such work exists in the immediate area in which [the claimant] lives"; (2) "whether a specific job vacancy exists for [the claimant]"; or (3) "whether [the claimant] would be hired if he applied for work." 42 U.S.C. § 423 (d)(2)(A).

clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

evidence in [the] case record.'" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quoting 20

C.F.R. § 404.1527 (c)(2)).  "'Medically acceptable clinical and laboratory diagnostic techniques'

include consideration of a patient's report of complaints, or history, as an essential diagnostic

tool."  *Id.* (internal quotation marks and alterations omitted).  Even when the opinion of a treating

physician is not given controlling weight, the ALJ is required to consider certain factors in

determining how much weight it should be given. These factors include the length of the

treatment relationship and frequency of examination, the nature and extent of the treatment

relationship, the medical support for the opinion provided, the consistency of the opinion with the

record as a whole, and whether the opinion is from a specialist in the areas at issue. *See* 20 C.F.R.

§ 404.1527 (c)(2)-(5).

In the Psychiatric/Psychological Impairment Questionnaire he completed, Dr. Kuru opined

that Wade would likely be absent from work more than three times a month as a result of her

impairments. The vocational expert who appeared at the hearing before the ALJ testified that an

individual who was absent from work more than three times a month would not be able to sustain

employment. Dr. Kuru also provided his opinion that Wade was markedly limited as to her abilities

to maintain attention and concentration for extended periods, to complete a normal workweek

without interruptions from psychologically based symptoms, and to perform at a consistent pace

without an unreasonable number and length of rest periods.

The ALJ stated in his decision that he had considered these opinions from Dr. Kuru, but

was affording them "minimal weight." (Doc. # 8-3, at 30, p. 29). According to the ALJ, "Dr.

Kuru[] apparently relied quite heavily on the subjective report of symptoms and limitations

provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported." (*Id.*). In explaining why he afforded minimal weight to the opinions expressed in Dr. Kuru's Questionnaire responses, the ALJ also stated that those opinions were "without substantial support from the other evidence of record," which, according to the ALJ, indicated that "improvement and stabilization are reported when the claimant is medication compliant and not abusing substances." (*Id.*).

The ALJ further stated the following with respect to his not affording significant weight to Dr. Kuru's opinions: "Furthermore, the possibility always exists that a doctor may express an opinion in an effort to assist a patient with whom he or she sympathizes for one reason or another. Another reality which should be mentioned is that patients can be quite insistent and demanding in seeking supportive notes or reports from their physicians, who might provide such a note in order to satisfy their patient's requests and avoid unnecessary doctor/patient tension." (*Id.*). While acknowledging that it is difficult to confirm the presence of these motives, the ALJ concluded by stating that "they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case." (*Id.*).

The regulations governing decisions by the Commissioner provide that "[w]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." 20 C.F.R. § 404.1527 (c)(2). *See also Thornton v. Colvin*, Civil No. 3:13-cv-1558 CSH, 2016 U.S. Dist. LEXIS 15504, at *24 (D. Conn. Feb. 9, 2016) ("A district court reviewing a denial of disability benefits must consider whether an ALJ's explanation for disregarding a treating physician's opinion on disability is sufficient and permissible under appellate authority."). "Failure to provide 'good reasons' for not crediting the opinion of a

claimant's treating physician is a ground for remand." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

The Court finds that some of the reasons stated by the ALJ for not crediting the opinions of Dr. Kuru are speculative, and, for that reason, are not "good reasons" for affording minimal weight to those opinions, i.e., that Dr. Kuru apparently relied quite heavily on Wade's subjective report of symptoms and limitations, and that Dr. Kuru may have expressed his opinions out of sympathy for Wade or because of her insistence that he do so. *See Sullivan v. Colvin*, Civil No. 4:12-cv-04033, 2013 U.S. Dist. LEXIS 70420, at *14 (W.D. Ark. May 17, 2013) ("[T]here is nothing in the record, nor does the ALJ refer to any evidence which in any way suggests [the treating physician's] findings are in some way attributed to sympathy [he] might have to Plaintiff or were the result of some type of physician/patient tension. To make such a finding is pure speculation on the part of the ALJ."). At the time he signed the Questionnaire form, Dr. Kuru had been a treating physician for Wade for a period of over two years and had examined her on at least nine occasions during that time. In that form, Dr. Kuru states that his diagnosis was supported by "psychiatric evaluation," and that his assessments of various mental activities were "derived from [his] evaluation of [his] patient." (Doc. # 8-8, at 156, p. 459 and at 157, p. 460). "[W]here there is no support in the record to question the treating physician's credibility or to find that the treating physician is leaning over backwards to support the plaintiff's claim for disability, the ALJ is merely speculating and has committed error." *Gallegos v. Colvin*, No. EP-13-CV-349-ATB, 2016 U.S. Dist. LEXIS 20059, at *11 (W.D. Tex. Feb. 18, 2016).

In addition to the reasons mentioned above, the ALJ also stated that Dr. Kuru's opinion was "without substantial support from the other evidence of record" and "departs substantially from the

rest of the evidence of record." (Doc. # 8-3, at 30, p. 29). The Court recognizes that other treatment records, including those of Dr. Kuru, could give rise to questions about some of the opinions Dr. Kuru expressed in his Questionnaire responses. For example, at the beginning of his treatment of Wade, and at various point throughout the course of that treatment, Dr. Kuru noted that one of Wade's goals was to secure employment. Although Dr. Kuru's treatment notes reflect periods of improvement and periods of decline in Wade's mental status, at no point do they indicate that employment was not an achievable goal because Wade was incapable of sustaining employment.

Where questions arise about the basis of the treating physician's opinion, the proper course of action  is not to simply reject the physician's opinion. In a case where an ALJ believes the treating physician's opinion on a claimant's disability is not supported by, and is contrary to, other medical evidence in the record, there is a "gap in the administrative record" that "is the result of the ALJ's failure to ask [the treating physician] to explain [his] opinion in the light of the other medical evidence." *Borgos-Hansen v. Colvin*, 109 F. Supp. 3d 509, 531 (D. Conn. 2015). The ALJ's obligation to ask for an explanation of the treating physician's opinion arises out of the non-adversarial nature of a benefits hearing:

> If an ALJ perceives inconsistencies in a treating physician's reports, the ALJ bears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly. In fact, where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel or by a paralegal. It is the rule in our circuit that the ALJ, unlike a judge in a trial, must [him]self affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding.

*Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (internal quotation marks and citations omitted).

"Where there are gaps in the administrative record or the ALJ has applied an improper legal standard, we have, on numerous occasions, remanded to the [Commissioner] for further development of the evidence." *Id.* at 82-83 (internal quotation marks omitted). "This further development of the record is necessary to place the Court in a position to decide whether the ALJ's decision denying benefits (if he adheres to it after remand) 'is based upon legal error or is not supported by substantial evidence.'" *Borgos-Hansen*, 109 F. Supp. 3d at 531 (quoting *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998)).

The ALJ also decided to afford minimal weight to the opinions expressed by Dr. Greenberg in the Psychiatric/Psychological Impairment Questionnaire he completed on behalf of Wade. As was the case with Dr. Kuru, Dr. Greenberg expressed his opinion that Wade would miss work more than three time a month as a result of her impairments. He further opined that Wade was markedly limited in sixteen categories of mental activities. The reasons stated by the ALJ for rejecting Dr. Greenberg's opinions were as follows:

> As with . . . Dr. Kuru[]'s prior opinion, Dr. Greenberg apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. . . . Furthermore, the claimant has engaged in and continues to engage in daily activities which are not limited to the extent one would expect, given limitations imposed by Dr. Greenberg. As reflected in the record, the claimant provided care for both of her parents prior to their deaths. She is also apparently able to care for her grandchild, which can be quite demanding both physically and emotionally, without any particular assistance.

(Doc. # 8-3, at 31, p. 30).

As was the case with the reasoning expressed by the ALJ for the rejection of Dr. Kuru's opinions, the Court finds the statement "Dr. Greenberg apparently relied quite heavily on the

subjective report of symptoms and limitations provided by the claimant" to be speculative and, consequently, not a "good reason" for affording minimal weight to Dr. Greenberg's opinions. To the extent questions arose about the limitations identified by Dr. Greenberg in light of the activities engaged in by Wade, this would be another "gap in the administrative record" that the ALJ was obligated to fill by seeking further information from this physician.

An additional problem resulting from the conclusion reached by the ALJ in the absence of additional medical evidence is that an ALJ "is not free to set his own expertise against that of a physician who submitted an opinion to . . . him." *Balsamo*, 142 F.3d at 81 (internal quotation marks and alterations omitted). The ALJ's decision indicates that Wade daily activities "are not limited to the extent one would expect, given limitations imposed by Dr. Greenberg." (Doc. # 8-3, at 31, p. 30). Wade testified at the administrative hearing that she "assisted hospice caring for my mother over the last year until she passed in January." (*Id.* at 74, p. 73). She  testified further, however, that the care she provided was "[j]ust being in the house with them, because I was a calming influence on my mother" and that she did not help her mother "with her activities of daily living." (*Id.* at 74, 75, pp. 73, 74). She also testified that she watches her granddaughter once or twice a week, "but it's only when my son-in-law is working from home, so there's someone else in the house with us if [her granddaughter] needs something that I can't do." (*Id.* at 75, p. 74). "In the absence of supporting expert medical opinion, the ALJ should not have engaged in his own evaluations of the medical findings." *Balsamo*, 142 F.3d at 81 (internal quotation marks omitted).

The Court recognizes, as was the case with Dr. Kuru, that the opinions expressed by Dr. Greenberg in his Questionnaire could give rise to legitimate questions. For example, when Dr. Greenberg examined Wade on March 18, 2013, he assessed her as "a woman with chronic

depression, dysthymia," which is less severe than major depression (Doc. # 8-10, at 86, p. 626). In his Questionnaire responses, however, Dr. Greenberg indicates a diagnosis of "major depressive disorder moderate recurrent." (*Id.* at 91, p. 631). These are the types of questions that should be addressed by "seek[ing] out more information from the treating physician and . . . develop[ing] the administrative record accordingly." *Rosa*,  168 F.3d at 79 (internal quotation marks omitted).

## B. The Claimant's Credibility

Wade also argues that the ALJ failed to properly evaluate her credibility. Specifically, Wade contends that "[t]he ALJ's credibility determination is not supported by substantial evidence." (Doc. # 11, at 24). The Commissioner responds that the ALJ properly evaluated Wade's credibility and subjective complaints of pain. Specifically, she argues that "the evidence of record did not substantiate Plaintiff's allegations to the disabling extent alleged." (Doc. # 12-1, at 34).

In evaluating a claimant's subjective complaints of symptoms and the limiting effects of those symptoms, the ALJ must engage in a two-step process:

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. . . . If the claimant does suffer from such an impairment, at the second step, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record. The ALJ must consider statements the claimant or others make about [her] impairments, [her] restrictions, [her] daily activities, [her] efforts to work, or any other relevant statements [she] makes to medical sources during the course of examination or treatment, or to the agency during interviews, on applications, in letters, and in testimony in its administrative proceedings.

*Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks, citations and alterations omitted).

The ALJ "is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Id.* At the same time, however, "[a] finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record." *Williams on Behalf of Williams v. Bowen*, 859 F.2d 255, 260-61 (2d Cir. 1988).

With regard to the first step, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . ." (Doc. # 8-3, at 24, p. 23). As to the second step, however, he found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (*Id.*). At a later point in his decision the ALJ states the particular reasons why he found Wade's statements not entirely credible: (1) "the medical evidence of record does not substantiate the degree of symptoms and limitations alleged"; (2) "the claimant has described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations"; (3) "despite the complaints of allegedly disabling symptoms, . . . there have been periods since the alleged onset date during which the claimant has not received any treatment for her purported impairments"; and (4) "the treatment the claimant received was conservative in nature, and . . . was generally successful in controlling her symptoms and improving her functioning." (*Id.* at 31, 32, pp. 30, 31).

With regard to the "medical evidence of record," the ALJ stated that "on November 29, 2012, Dr. Kuru[] reported that the claimant was doing generally better and that her mood was stable, when she was medication compliant and substance free." (*Id.* At 31, p. 30). As indicated in

-22-

the previous section of this ruling, this matter is being remanded for further development of the record with regard to the opinions of the treating physicians, i.e., Dr. Kuru and Dr. Greenberg. Additional information from Wade's treating physicians could affect the ALJ's evaluation of her credibility, since one of the factors considered by the Commissioner in determining the extent to which symptoms affect a claimant's capacity to work is "the extent to which there are any conflicts between your statements and the rest of the evidence, including . . . statements by your treating . . . source . . . about how your symptoms affect you." 20 C.F.R. § 404.1529 (c)(4). It is expected that the ALJ will re-evaluate Wade's credibility in light of any additional evidence that is received in further proceedings.

In discussing Wade's daily activities, the ALJ stated, among other things, that "the claimant had also cared for her parents, prior to their respective deaths, which [was] very demanding." (Doc. # 8-3, at 32, p. 31). The Court can find no evidence in the record to support the finding that Wade cared for her father prior to his death. With regard to her mother, Wade testified at the hearing that she had "assisted hospice caring for my mother over the last year until she passed in January," by "[j]ust being in the house with them, because I was a calming influence on my mother to some extent and she wouldn't get quite as aggressive and abusive towards the ladies from hospice." (*Id.* at 74, p. 73). She further testified that she did not "provide any custodial care for her [mother] in terms of helping her with her activities of daily living[.]" (*Id.* at 75, p. 74). "[A]n ALJ's credibility determination is generally entitled to deference on appeal." *Selian v. Astrue*, 708 F.3d 409, 420 (2d Cir. 2013). When an ALJ's credibility finding is "based on a misreading of the evidence," however,  "it [does] not comply with the ALJ's obligation to consider 'all of the relevant medical and other evidence,' 20 C.F.R. § 404.1545(a)(3), and cannot stand."  *Genier*, 606 F.3d at 50. In the

-23-

absence of additional evidence on this point, the ALJ cannot rely on this characterization of

Wade's testimony as a basis for finding her  "statements concerning the intensity, persistence and

limiting effects of [her] symptoms . . . not entirely credible." (Doc. # 8-3, at 24, p. 23).

The ALJ also found Wade's statements regarding the limiting effects of her symptoms to be

not entirely credible because there were periods of time after the onset of her impairments when

she was not receiving any treatment, and because the treatment she did receive was conservative in

nature and generally successful in improving her functioning. The Court believes these findings

relate to the "gap in the administrative record" discussed in connection with the treating physician

rule and should be re-evaluated in light of evidence received upon remand and further proceedings.

Along these same lines, the Court notes that it is improper for an ALJ to "impose[] [his] notion that

the severity of a[n] . . . impairment directly correlates with the intrusiveness of the medical

treatment ordered." *Shaw v. Chater*, 221 F.3d 126, 134-35 (2d Cir. 2000). Additionally, "[w]hile

failure to continue treatment is a legitimate factor for the ALJ to consider, . . . the ALJ has an

obligation to take the claimant's mental limitations into account in determining whether such a

failure truly reflects an improvement in [her] condition." *Thompson* v. *Apfel*, 97 Civ. 7697 (LAK)

(JCF), 1998 U.S. Dist. LEXIS 16007, at *14-15 (S.D.N.Y. Oct. 9, 1998). The ALJ must bear these

principles in mind in conducting further proceedings in this matter.

CONCLUSION

For the foregoing reasons, Wade's motion for judgment on the pleadings (**doc. # 10**) is

**GRANTED IN PART** and **DENIED IN PART**. The motion is granted to the extent that the Court

remands this case to the Commissioner for further proceedings consistent with this Ruling,

including further development of the record with regard to the opinions Dr. Kuru and Dr.

Greenberg, and a re-evaluation of the claimant's subjective complaints of symptoms and the limiting effects of those symptoms.

The Commissioner's motion to affirm the decision of the Commissioner (**doc. # 12**) is **DENIED**.

The Clerk is directed to close this case.

SO ORDERED this 24th  day of March, 2016.

_____/s/ DJS_____
                Dominic J. Squatrito
                United States District Judge